MARK P. ROBINSON, JR., SBN 054426
KEVIN F. CALCAGNIE, SBN 108994
DANIEL S. ROBINSON, SBN 244245
**ROBINSON CALCAGNIE ROBINSON
SHAPIRO DAVIS, INC.**
19 Corporate Plaza Dr.
Newport Beach, California 92660
Telephone:  (949) 720-1288
Facsimile:   (949) 720-1292
mrobinson@rcrsd.com
kcalcagnie@rcrsd.com
drobinson@rcrsd.com

WAYNE R. GROSS,  SBN 138828
  *WGross@GGTrialLaw.com*
MICHAEL I. KATZ, SBN 181728
  *MKatz@GGTrialLaw.com*
**GREENBERG GROSS LLP**
650 Town Center Drive, Suite 650.
Costa Mesa, California 92626
Telephone:  (949) 380 2800
Facsimile:  (949) 383-2801

*Attorneys for Plaintiff and the Proposed Classes*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL HALE, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> DRAFTKINGS, INC., a Delaware Corporation, and FANDUEL, INC., a Delaware Corporation, <br><br> Defendants. | Case No. 8:15-CV-1879 <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff DANIEL HALE, by and through his attorneys Robinson Calganie Robinson Shapiro Davis, Inc. and Greenberg Gross LLP, individually and on behalf of all others similarly situated, alleges the following:

## NATURE OF THE ACTION

1.     Americans love sports, and the National Football League ("NFL") is the most popular sport in the United States.  One of the ways fans follow the NFL is by playing fantasy football.  Fans "draft" players for certain positions from across all the teams in the league, and they compete against other fans to see who can pick the best teams.  Most fantasy games are played amongst friends purely for recreation.

2.     Taking advantage of the popularity of fantasy football, DraftKings, Inc. ("DraftKings") and FanDuel. Inc. ("FanDuel") offer on-line gambling websites where consumers place bets each week, and winnings are distributed based on how well each player's team performs.

3.     Defendants trick consumers into believing that playing on their websites is not gambling because winners are determined by skill not luck.  But in fact, Defendants operate an illegal and deceptive gambling enterprise that crosses all state lines.  What consumers do not know is that the game is rigged: DraftKings and FanDuel allowed their personnel — many with information not available to customers — to play on each other's sites and win large amounts of money to the direct detriment of their customers.

4.     This  action seeks to redress the deceptive and collusive practices committed by Defendants in connection with their on-line fantasy gambling enterprise, and to obtain full remuneration for every dollar lost by players on either site.  Plaintiff brings this action seeking injunctive relief and damages on behalf of himself and the hundreds of thousands or millions of consumers who have been victimized by Defendants' misleading and deceptive conduct.

CLASS ACTION COMPLAINT

**JURISDICTION AND VENUE**

5.     Jurisdiction is proper in this Court under 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which members of the class of plaintiffs are citizens of states different from Defendants.

6.     This Court also has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1367, 1961, 1962 and 1964.   This Court has personal jurisdiction over Defendants under 18 U.S.C. § 1965.  In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiff ordinarily would expect to try them in one judicial proceeding.

7.     Venue lies within this judicial district under 28 U.S.C. § 1391(b)(1) and (c)(2) because Plaintiff is a citizen of California residing in this District; Defendants' contacts are sufficient to subject them to personal jurisdiction in this District; and because acts giving rise to the claims at issue in this Complaint occurred in this District.

**PARTIES**

8.     Plaintiff Daniel Hale is an individual and a citizen of California.  He resides in Brea, California, in the County of Orange.

9.     Defendant DraftKings is a Delaware corporation founded in 2012, with its principal place of business in Boston, Massachusetts.

10.     Defendant FanDuel is a Delaware corporation founded in 2009, with its principal place of business in New York, New York.

**FACTUAL BACKGROUND**

11.     A fantasy sport is a contest where participants form imaginary teams of real players of a sport.  The teams compete based on the statistical performance of players in actual games.  The performance of players in actual games is converted

into points, based on a point system, which are then totaled according to a roster selected by each fantasy team's manager.  Fantasy team owners draft, cut and trade players, just like in real sports.

12.   Defendants are fantasy sports contest providers.  They operate websites that enable participants to play one-day or one-week fantasy sports contests against other participants on the same website and earn money based on individual player performances in major American sports leagues, such as Major League Baseball, the National Hockey League, the National Football League, and the National Basketball Association.

13.   Defendants claim their contests are games of skill and, therefore, not subject to gambling industry regulations.  They spend millions of dollars on marketing to convey and reinforce this message.  For example, in a TV commercial, FanDuel invites viewers to "get paid for [your] knowledge" if you are "smarter than the average fan."[1]  DraftKings also ran TV ads with the same message, exhorting viewers to "use your knowledge and showcase your skills"[2] and stating "there's a game within a game that requires a different set of skills . . . we don't just play, we are players, we train and we win."[3]  DraftKings' terms and conditions has a section titled "Contest of Skill" which claims that "[c]ontests offered on the website are contests of skill."[4]  FanDuel's terms and conditions likewise represents that "FanDuel is a game of skill."[5]

14.   As a result of representations made in their advertising blitz and terms and conditions, Defendants added millions of new users, including Plaintiff.

---

[1] http://www.ispot.tv/ad/AVPC/fanduel-com-one-week-fantasy-football-get-paid-for-knowledge (last visited on November 12, 2015).

[2] https://youtu.be/VDa-cDu8KYg (last visited on November 12, 2015).

[3] https://youtu.be/bfCm6PJuL5I (last visited on November 12, 2015).

[4] https://www.draftkings.com/help/terms (last visited November 12, 2015).

[5] https://www.fanduel.com/terms (last visited November 12, 2015).

- 3 -

CLASS ACTION COMPLAINT

Plaintiff paid to play fantasy sports on DraftKings' website during the 2015 NFL season.

15.    To play Defendants' daily fantasy sports contests, a player must create an account, deposit money in it, and use the money to pay entry fees for each game. Winners of each fantasy sports contest receive money credited to their accounts. The entry fees range from less than a dollar to thousands of dollars,[6] and the prize pools can pay millions.

16.    The odds of winning vary depending on the pool size, which typically could have dozens or even hundreds of participants. Typically winnings go to only a small percentage of players. Sports Business Daily analyzed publicly available data and found that, for the first half of the 2015 Major League Baseball season, 91% of profits were won by just 1.3% of players.[7] Bloomberg concurred and offered this "simple truth": "over time nearly all of the prize money flows to a tiny elite equipped with elaborate statistical modeling and automated tools that can manage hundreds of entries at once and identify the weakest opponents."[8]

17.    At all relevant times, Defendants did not prohibit their employees from playing fantasy sports on competing websites. In fact, Paul Liberman, DraftKings co-founder, admitted in his speech at Babson College on September 25, 2015 that DraftKings employees made "significantly more money off of our competitors' sites than they do working for DraftKings."[9] Defendants concealed this practice from the public and continued to aggressively tout that fantasy sports on their websites were

---

[6] http://www.dailyfantasysports101.com/draftkings-nfl-5-million-opening-week/ (last visited November 12, 2015)

[7] http://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx (last visited on November 12, 2015).

[8] http://www.bloomberg.com/news/articles/2015-09-10/you-aren-t-good-enough-to-win-money-playing-daily-fantasy-football (last visited on November 12, 2015).

[9] https://www.bostonglobe.com/business/2015/10/05/draftkings-bans-employees-from-competitors-sites/s36ig5e0eV0OR9C55R8hwL/story.html (last visited on November 12, 2015).

CLASS ACTION COMPLAINT

fair, lucrative and based on skill and knowledge.  By doing so, they skewed the odds of winning against contestants not employed by fantasy sports contest operators.

18.     Defendants' employees have a distinct advantage over other contestants employed by fantasy sports contest operators: they have unfettered real time access to material inside information, including but not limited to cumulative statistical data on how rosters have fared and will likely fare if entered in rival sites, overall ownership percentages of players, data on particular players, identifying low-owned or undervalued players, and analytics related to particular strategies that could increase a player's chances of winning.  DraftKings CEO Jason Robins admitted in an interview with ESPN that "[i]nformation like that would give people an advantage . . . if it's information that others don't have and it pertains to the game."[10]  He further admitted that "[d]ata that could give players an advantage is only allowed to be accessed by certain types of employees, such as customer service or engineering workers."[11]

19.     As such, it comes as no surprise that DraftKings employees have won over $ 6 million in FanDuel's fantasy sports games.[12]  In June 2015, a FanDuel employee won DraftKings' King of Boston contest for $50,000.[13]  More recently, a DraftKings employee beat 229,833 contestants on FanDuel to win $350,000.[14]  As Defendants admitted, their employees have exclusive access to material data, *i.e.*,

---

[10] http://espn.go.com/espn/print?id=13924648&type=HeadlineNews&imagesPrint=off (last visited on November 12, 2015).

[11] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/ (last visited on November 12, 2015).

[12] http://www.businessinsider.com/draftkings-daily-fantasy-sports-fanduel-2015-10 (last visited on November 12, 2015).

[13] http://www.nytimes.com/2015/10/12/sports/fantasy-sports-draftkings-fanduel-insiders-edge-football.html?_r=0 (last visited November 12, 2015).

[14] http://larrybrownsports.com/fantasy/ethan-haskell-draft-kings-fanduel-profile/276741 (last visited November 12, 2015).

ownership percentages of players.[15]   But Defendants were quick to attribute the employee's winning to "coincidence."[16]

20.   Contrary to Defendants' representations, they are engaged in an illegal and deceptive gambling enterprise.   In fact, on October 15, 2015, the Nevada Gaming Board determined that Defendants were engaged in unlicensed gambling and suspended their operations.   The Board determined that the sites operate gambling enterprises, and that they constitute sports pools, which are patently illegal gambling operations.

21.   On October 6, 2015, the New York Attorney General began to investigate whether Defendants' employees' winnings were based on inside information.   Until then, Plaintiff did not know that Defendants' employees were allowed to play fantasy sports on competing websites.   On October 15, 2015, the Federal Bureau of Investigation announced a criminal investigation of Defendants arising from the misconduct alleged in this Complaint.   Not surprisingly, a federal grand jury is being convened by the U.S. Attorney's office in Tampa, Florida whose reported purpose is to consider whether Daily Fantasy Sports operators are in violation of Florida and federal anti-gambling laws.

22.   Only after its deceptive practices were made public, DraftKings began advising its customers that it has enacted policies "permanently prohibit[ing] [DraftKings employees] from participation in any public daily fantasy sports contests for money," as well as policies prohibiting "employees from any other Daily Fantasy Sports contest operator from participating in games on DraftKings."[17]   After its deceptive practices were made public, FanDuel made a similar announcement on its

---

[15] https://rotogrinders.com/threads/draftkings-ownership-leak-850584?page=1#reply-850635 (last visited on November 12, 2015).  Ownership percentages of players help in the selection of undervalued low-owned players.

[16] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/ (last visited on November 12, 2015).

[17] http://playbook.draftkings.com/press/draftkings-statement-1072015/ (last visited November 12, 2015).

CLASS ACTION COMPLAINT

website: "We have permanently banned our employees from playing any daily fantasy games for money, on any site. We will also require all customers to confirm that they are not an employee of any other third party fantasy site, and if they are, they will not be allowed to access our site."[18]

23.     Robins has admitted having had "some reservations" about DraftKings employees participating in fantasy sport contests on competing websites, stating "I, to be honest, did have some reservations about this, and have spoken in the past with some of our competition about whether we should have policies such as this one in place."[19] But, despite these reservations, Defendants did nothing to stop the practice. When asked in an interview why Defendants did not ban their employees from playing fantasy sports on competing websites, Robins explained: "[c]ertainly we may have been late to the game on the employee ban—and hindsight 20/20, that's something I admit we should have done before."[20]

24.     Had Plaintiff and the proposed class (defined below) known that Defendants' employees with access to material non-public information would participate in fantasy sports contests, they would not have paid to play fantasy sports on Defendants' websites.

25.     Plaintiff and the proposed class were injured by Defendants' course of deceptive, misleading, and negligent conduct in allowing their employees with material inside information to play fantasy sports on competing websites, concealing such practice from the public and marketing their contests as being fair, lucrative, and based purely on skill and knowledge.

---

[18] https://newsroom.fanduel.com/2015/10/07/statement-to-the-press/ (last visited November 12, 2015).

[19] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/ (last visited on November 12, 2015).

[20] http://fortune.com/2015/10/08/draftkings-ceo-discusses-scandal/ (last visited November 12, 2015).

CLASS ACTION COMPLAINT

26.   DraftKings and FanDuel act in concert to create and maintain this illegal gambling enterprise.   Personnel from both Defendants benefited by using inside information to fleece everyday consumers who reasonably believe they are playing a fair game of skill.  It is only because both FanDuel and DraftKings allowed their personnel to secretly play on each others' sites that the practice could occur and remain hidden.  If either Defendant revealed this deceptive practice or informed consumers that they would not allow their employees to play on any fantasy site, then the other Defendant would be forced to follow suit.  And both Defendants benefit by attracting top flight employees with the promise of substantial winnings and by maintaining a large customer base by not revealing that the game is rigged.

## CLASS ALLEGATIONS

27.   Plaintiff brings this action, individually and on behalf of others similarly situated, as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

28.   The class Plaintiff seeks to represent (collectively, the "Class") is defined as follows:

> All residents of the United States of America who paid to play
> fantasy sports on FanDuel or DraftKings' website and competed
> with any entry from FanDuel or DraftKings personnel.

29.   Plaintiff also seeks to represent a subclass defined as follows:

> All residents of California who paid to play fantasy sports on
> FanDuel or DraftKings' website and competed with any entry
> from FanDuel or DraftKings personnel.

30.   Excluded from the Class are Defendants, any entity in which either Defendant has a controlling interest or is a parent or subsidiary of, or any entity that is controlled by either Defendant, and Defendants' officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors, and assigns.

31.   The proposed Class encompasses millions of individuals who are

- 8 -
CLASS ACTION COMPLAINT

geographically dispersed throughout the United States.   Therefore, the proposed Class is so numerous that joinder of all members is impracticable.

32.   All members of the Class have been subject to and affected by the same practices and policies described herein.   There are questions of law and fact that are common to the Class and which predominate over any questions affecting only individual members of the Class.   These questions include, but are not limited to the following:

a.   Whether Defendants operate an illegal deceptive gambling enterprise;

b.   Whether Defendants made the representations set forth above and substantially similar representations to Plaintiff and members of the proposed class;

c.   Whether Defendants' advertisements were false, misleading or unfair;

d.   Whether Defendants owed duties to Plaintiff and the proposed class, the scope of those duties and if they breached those duties;

e.   Whether Defendants fraudulently induced Plaintiff and the proposed class into using their website under false pretenses, through material misrepresentations or material omissions;

f.   Whether consumers were harmed by Defendants' actions as described above;

g.   The extent of the damages caused by Defendants' acts;

h.   Whether Defendants' employees used non-public data and/or information to gain an advantage at daily fantasy sports sites, whether Defendants acted in concert to condone, allow or promote this practice, or whether Defendants were negligent in allowing employees to access and use confidential data, or were negligent or committed fraud in failing to disclose to Plaintiff and the proposed class that these practices were occurring;

i.   Whether Defendants engaged in deceptive and/or misleading activity with the intent to defraud Plaintiff and members of the

- 9 -
CLASS ACTION COMPLAINT

Class;

j.  Whether Defendants are liable to Plaintiff and members of the Class for damages for conduct actionable under RICO;

k.  Whether Defendants are is liable to Plaintiff and members of the Class for damages for conduct actionable under various state Consumer Protection Statutes;

l.  Whether Defendants unjustly enriched themselves by its acts and omissions, at the expense of Plaintiff and members of the Class; and

m.  The extent of the damages caused by Defendants' acts.

33.  The claims of the named Plaintiff is typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that Plaintiff and the other members of the Class were subject to the same wrongful policies and practices by Defendants.

34.  The named Plaintiff will fairly and adequately represent the interests of the proposed Class.  He is committed to the vigorous prosecution of the Class' claims and has retained attorneys who are qualified to pursue this litigation and have experience in class actions.

35.  The prosecution of separate actions by individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members of the Class who are not parties to the action, or could substantially impair or impede their ability to protect their interests.

36.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class.  Such incompatible standards and inconsistent or varying adjudications, on what would necessarily be the same essential facts, proof

CLASS ACTION COMPLAINT

and legal theories, would also create and allow to exist inconsistent and incompatible rights within the Plaintiff Class.

37.     Defendants have acted or refused to act on grounds generally applicable to the Class making injunctive relief appropriate.

38.     The questions of law and fact common to members of the Class predominate over any questions affecting only individual members.

39.     Notice to the proposed Class can be achieved through electronic mail and/or U.S. mail to the addresses of the Class members that are kept within Defendants' records.  Notice can also be supplemented via publication.

40.     A class action is superior to other available methods for the fair and efficient adjudication of the controversies herein in that:

>    a.     Individual claims by the Class members are impractical as the costs of pursuit far exceed what any one individual Plaintiff has at stake;
>
>    b.     As a result, individual members of the Class have no interest in prosecuting and controlling separate actions;
>
>    c.     It is desirable to concentrate litigation of the claims herein in this forum;
>
>    d.     The proposed Class action is manageable.

41.     Plaintiff is not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

//
//
//
//
//
//

- 11 -
CLASS ACTION COMPLAINT

# FIRST CAUSE OF ACTION

## Violations Of The Racketeer Influenced And Corrupt Organizations Act
## (18 U.S.C. §1962(c))

42.     Plaintiff restates and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

43.     Defendants and their personnel are "persons" within the meaning of 18 U.S.C. §1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

44.     DraftKings and its personnel associated with or combined with FanDuel and its personnel for the common purpose of engaging in a course of racketeering conduct, specifically, the creation and operation of a nationwide deceptive gambling enterprise.  This association in fact enabled Defendants to deceptively market and operate in concert their websites and to profit at the direct detriment of their customers.

45.     Defendants and their personnel received substantial revenue from their scheme, and these revenues were far greater than they would have been had the deceptive acts not been undertaken. As distinct entities, both of the Defendants and their personnel profited from the exercise of the enterprise.

46.     The behavior of the Defendants, as distinct entities acting in concert, constituted an ongoing pattern of activity that affected interstate commerce, because, *inter alia*, the deceptive activities described herein led to the marketing and sale of daily fantasy sports contests to millions of individuals throughout the United States.

47.     Defendants conducted and participated in the affairs of their deceptive marketing enterprise through patterns of racketeering activity that included acts indictable under 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), and § 1952 (use of interstate facilities to conduct unlawful activity).

CLASS ACTION COMPLAINT

48.   Defendants' use of the mails and wires to perpetrate their fraud involved thousands of communications, including but not limited to:

a.   communications with and among enterprise participants that led to the suppression and failure to timely disclose negative information that called into question the fair play of their contests;

b.   communications with and among the enterprise participants that fraudulently misrepresented the fair play of their contests amongst themselves and others;

c.   communications with individuals, including Plaintiff, inducing payments for daily fantasy sports contests by misrepresenting the fair play of their contests;

d.   receiving the proceeds in the course of and resulting from Defendants' improper scheme;

e.   transmittal and receipt of monies from players;

f.   communications with and among the enterprise participants to conceal the fraud occurring by virtue of failing to disclose the results of negative reports;

g.   communications with and among the enterprise participants to develop and implement the promotional strategy;

h.   communications with and among the enterprise participants to develop and implement the publications strategy; and

i.   transmittal and receipt of payments in exchange for, directly or indirectly, activities in furtherance of the deceptive marketing scheme.

49.   Defendants also conducted and participated in the affairs of their deceptive marketing enterprise through patterns of racketeering activity that included an act involving gambling chargeable under California law and punishable by imprisonment for more than one year and which is indictable under 18 U.S.C. §§

CLASS ACTION COMPLAINT

1084 (relating to the transmission of gambling information), 1953 (relating to interstate transportation of wagering paraphernalia), and 1955 (relating to the prohibition of illegal gambling businesses).

50.     Defendants knew that without their deceptive scheme (hiding the fact that the game is rigged in favor of Defendants' personnel), consumers would not have paid to play daily fantasy sports on their websites.  At all times during the deceptive scheme, Defendants and the enterprise participants had a legal and ethical obligation of candor and honest dealing with consumers.

51.     The conduct of the Defendants' marketing scheme described above constituted "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Defendants' decisions and activities in connection with the daily fantasy sports marketing scheme to routinely conduct their transactions in such a manner constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

52.     The above-described racketeering activities amounted to a common course of conduct intended to deceive and harm the public, Plaintiff, and members of the Class.  Each such racketeering activity was related, had similar purposes, involved similar or the same participants, had similar methods of commission, and had similar results affecting the same or similar victims, including Plaintiff and members of the Class.

53.     Plaintiff and members of the Class have been injured in their property by reason of these violations in that Plaintiff and members of the Class paid millions of dollars to play daily fantasy sports that they would not have paid had Defendants not engaged in this pattern of racketeering activity.

54.     The injuries to Plaintiff and members of the Class were directly and proximately caused by Defendants' racketeering activity.

55.     By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiff and members of the Class for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees.

56.     By reason of the foregoing, and as a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiff and members of the Class have suffered damages. Plaintiff and the Class are entitled to compensatory damages, equitable relief, punitive damages, costs and reasonable attorneys' fees.

## SECOND CAUSE OF ACTION

### Conspiracy To Violate Title 18 United States Code Section 1962(c)

### (18 U.S.C. §1962(d))

57.     Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

58.     Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

59.     Defendants have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the promotion of deceptive and illegal daily fantasy sports contests as described previously through a pattern of racketeering activity.  Defendants conspired with, *inter alia*, each other, their personnel, publicists, sales representatives, and other intermediaries to promote daily fantasy sports contests  and  to suppress information regarding the unfair operation of their websites.

60.     Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy,

including material misrepresentations and omissions designed to defraud Plaintiff and members of the Class.

61.    The nature of the above-described acts by Defendants and their co-conspirators' in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but also were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

62.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff and members of the Class have been and continue to be injured in their business or property as set forth more fully above.

63.    Defendants sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts:

    a.    Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342;

    b.    Multiple instances of mail fraud violation of 18 U.S.C.  §§  1341 and 1346;

    c.    Multiple instances of wire fraud violations of 18 U.S.C. §§ 1341 and 1346;

    d.    Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

    e.    Operating an unlawful and deceptive gambling enterprise in violation of state and federal law.

64.    Defendants' violations of the above federal laws and the effects thereof are ongoing and will continue.  Plaintiff and members of the Class have been injured in their property by reason of these violations in that Plaintiff and members of the

CLASS ACTION COMPLAINT

Class have paid hundreds of millions of dollars to play daily fantasy sports that they would not have paid had Defendants not conspired to violate 18 U.S.C. § 1962(c).

65.    Injuries suffered by Plaintiff and members of the Class were directly and proximately caused by Defendants' racketeering activity as described above.

66.    Individuals, including Plaintiff and members of the Class, directly relied on the representations constituting the racketeering activities of the Defendants. Plaintiff and members of the Class, both directly and indirectly, relied on Defendants' promotions and representations regarding the fair play of their contests. Because Defendants controlled all knowledge upon which the claims of their contests' fair play were based, Plaintiff and members of the Class, as well as others in the public were obligated to rely on Defendants' representations. Further, Defendants perpetuated this reliance by taking the steps itemized above to suppress the dissemination of critical information regarding the unfair operation of their contests.

67.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to Plaintiff and the Class for three times the damages Plaintiff and members of the Class have sustained, plus the cost of this suit, including reasonable attorney's fees.

68.    By reason of the foregoing, and as a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiff and members of the Class have suffered damages. Plaintiff and members of the Class are therefore entitled to compensatory damages, equitable relief, punitive damages, costs and reasonable attorneys' fees.

//

//

//

### THIRD CAUSE OF ACTION

**Violations of the Unfair Competition Law ("UCL")**

**California Business & Professions Code §17200 *et seq.***

**(California Subclass Only)**

69.   Plaintiff restates and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

70.   Plaintiff and the members of the proposed California Subclass are consumers who paid to play on Defendants' websites in California.

71.   California Business & Professions Code §17200 *et seq.* ("UCL") prohibits acts of unfair competition, including any "unlawful, unfair, or fraudulent business act or practice," including but not limited to false advertising.

72.   Defendants are, each of them , businesses doing business within the State of California.  More specifically, Defendants' gambling sites are used by tens of thousands of California residents, including Plaintiff and members of the proposed California Subclass, who believed these sites to be fair contests of skill.

73.   Defendants' conduct in carrying out their business violated the UCL because Defendants made representations and omissions, as detailed above, which are false, deceptive, or misleading.  In particular, because Defendants' conduct has been directed to California consumers, and thousands of California consumer have used and lost money through Defendants' operations.  Thus, the UCL can be fairly applied to a class of consumers within California who have been harmed as a result.  Moreover, California has a substantial interest in preventing fraudulent practices within the state which may have an effect both in California and throughout the rest of the country.

74.   Specifically, Plaintiff and the proposed California Subclass Members have been injured by the false and misleading statements of Defendants.  Plaintiff

and the proposed California Subclass Members paid a premium price to play on a fantasy website they reasonably believed to be fair; had Defendants disclosed that their games are rigged, they would not be able to command the price premium they charge. Additionally, Plaintiff and the proposed California Subclass Members have lost money as a result of Defendants' unfair policies that allowed Defendants' employees to unfairly compete on the Defendants' sites. Plaintiff and all members of the proposed California Subclass are entitled to relief, including full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of their unfair business practices. Plaintiff and all members of the proposed California Subclass are also entitled to consequential damages including such taxes and fees that may have been paid in connection with the use of Defendants' websites.

75. Plaintiff and the other members of the Class further seek to enjoin the unfair and deceptive practices described above. Absent injunctive relief, Defendants will continue to cheat customers on their gaming websites.

## FOURTH CAUSE OF ACTION

**Untrue and Misleading Advertising in Violation of California Bus. & Prof. Code §17500, *et seq.***

**(California Subclass Only)**

76. Plaintiff restates and incorporate herein by reference the preceding paragraphs as if fully set forth herein. This cause of action applies only to the proposed California Subclass.

77. California Business & Professions Code § 17500 prohibits various deceptive practices in connection with the dissemination, in any manner, of representations which are likely to induce or which are made for the purpose of

CLASS ACTION COMPLAINT

inducing, directly or indirectly, customers to transact for services, including the services provided by Defendants that are at issue herein.

78.     As detailed above, Defendants' advertisements for their gambling sites were materially false and concealed material facts.   Defendants' material misrepresentations and omissions alleged herein were intended to, and did induce the consuming public to transact for Defendants' services thinking that they were fair games of skill.   These misrepresentations and omissions were in violation of Business & Professions Code §17500.

79.     As a direct result of the foregoing, Plaintiffs and the other members of the proposed California Subclass, and the general public, are entitled to injunctive, restitutionary, and consequential damages such as taxes, fees, etc., as previously alleged in the Third Cause of Action.

## FIFTH CAUSE OF ACTION
### Negligence

80.     Plaintiff restates and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

81.     Defendants owed duties to Plaintiff and the proposed class as users and paying customers of their site to use reasonable care to provide true, reliable and safe information and fair contests, and to keep information that might compromise the fairness of their contests secure.

82.     Defendants breached their duties to Plaintiff and the proposed class by failing to prevent their employees with inside information and data from competing against Plaintiff and the proposed class.

CLASS ACTION COMPLAINT

83.     Defendants breached their duties to Plaintiff and the proposed class by failing to prevent others' employees with inside information and data from competing against Plaintiff and the proposed class.

84.     Defendants breached their duties to Plaintiff and the proposed class by failing to secure the inside information used by their respective employees to unfairly compete against Plaintiff and the proposed class.

85.     Defendants failed to use reasonable care in communicating the information about safety and security of data, employee access to data and the ability of employees to use material, non-public data to compete with Plaintiff and the proposed classes on other websites, and in allowing employees of other companies with material non-public data to compete on fantasy sports websites where Plaintiff and the proposed class played.

86.     As a direct and proximate result of Defendants' negligence, Plaintiff and the proposed class were damaged in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### Fraud and Misrepresentation

87.     Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

88.     Plaintiff and the proposed class purchased the use of Defendants' services, and placed money at risk in Defendants' online games, based upon representations and national advertisements and commercials wherein Defendants repeatedly represented that their contests were fair games of skill.  Defendants also willfully failed to disclose that employees, agents, owners and/or others with non-public information and access to entries submitted by Plaintiff and the class members, would use this information to compete with and gain an unfair advantage

CLASS ACTION COMPLAINT

over Plaintiff and the class members, thereby diminishing Plaintiff and the class' ability to use skill to win.

89.     These representations were false when made.  As specified above, Defendants were aware that their employees were able to, and in fact did, gain unfair advantage in competition over all other players by virtue of their access to material non-public information.

90.     These representations were material in that Plaintiff and the proposed class would not have deposited money or engaged in any activity on Defendants' websites had they known that they were competing with contestants with material non-public information.

91.     Defendants were aware that Plaintiff and the proposed class paid to play fantasy sports on their websites because of assurances that the games were fair and based on skill.

92.     As detailed above, Plaintiff and the proposed class acted in reliance on the false, material representations and omissions made by Defendants, which caused them injury.  As a result of Defendants' fraudulent representations and fraudulent omissions, Plaintiff and the proposed class were induced to enter into contracts that they otherwise would not have entered into -- to their financial detriment.

## SEVENTH CAUSE OF ACTION

### Negligent Misrepresentation

93.     Plaintiff restates and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

94.     Defendants owed duties to Plaintiff and the proposed class as users and paying customers of their site to use reasonable care to provide true, reliable and safe information and fair contests.

CLASS ACTION COMPLAINT

95.    In the course of their business, profession and employment, Defendants and their agents, representatives and employees repeatedly represented to Plaintiff, to members of the proposed Class, and to the public, that their contests were fair games of skill.

96.    Defendants also did not disclose that employees, agents, owners and/or others with non-public information and access to entries submitted by Plaintiff and the class members, would use this information to compete with and gain an unfair advantage over Plaintiff and the class members, thereby diminishing Plaintiff and the class' ability to use skill to win.

97.    Regardless of whether Defendants believed the representations, the representations were false, and Defendants had no reasonable grounds for believing the representations were true when they made them.

98.    Regardless of whether Defendants were aware that their employees, agents, owners and/or others with non-public information and access to entries submitted by Plaintiff and the class members were using this information to compete with and gain an unfair advantage over Plaintiff and the class members, Defendants should have known this, and were negligent in not discovering it and communicating that information to Plaintiffs and other members of the proposed Class.

99.    Plaintiff and the proposed class justifiably relied upon the information supplied by Defendants, and, as a result, engaged in business with Defendants and lost money.

100.  As a direct and proximate result of Defendants' negligence, Plaintiff and the proposed class were damaged in an amount to be proven at trial.

//

//

//

- 23 -
CLASS ACTION COMPLAINT

### EIGHTH CAUSE OF ACTION

### Civil Conspiracy

101.  Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

102.  As detailed above, Defendants engaged in a corrupt or unlawful combination and/or agreement with each other to do an unlawful act and continued to act in concert after the act was discovered.

103.  Specifically, by affirmatively agreeing to allow competitors' employees to play fantasy sports on their own sites and concealing this agreement from Plaintiff and the proposed class, Defendants committed negligence and/or fraud.  This was done pursuant to or in furtherance of the conspiracy to allow their employees the opportunity to make money, to continue to attract new players to their websites and otherwise, to generate revenues from their unlawful activities.

104.  Defendants gave each other assistance and encouragement in accomplishing the tortious result of having their employees compete with and beat players on other daily fantasy sports sites.

105.  As a direct and proximate result of Defendants' concerted actions, Defendants are liable to Plaintiff and the members of the proposed class.

### NINTH CAUSE OF ACTION

### Unjust Enrichment

106.  Plaintiff restates and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

107.  Plaintiff and the members of the proposed class conferred a benefit on Defendants by depositing money and playing in contests on their websites.

CLASS ACTION COMPLAINT

108.   Defendants have been unjustly enriched in retaining revenues derived from these deposits and contest entries.   Retention of revenues under these circumstances is unjust and inequitable because Defendants misrepresented facts concerning the fairness of contests available on their sites.

109.   Plaintiff and members of the proposed class were injured as a direct and proximate result of Defendants' misrepresentations and omissions because they paid to play fantasy sports on Defendants' websites, which they would not have done had they known the true facts.   Because Defendants' retention of the non-gratuitous benefit conferred on them by Plaintiff and the members of the proposed classes is unjust and inequitable, Defendants must pay restitution to Plaintiff and the members of the proposed class for their unjust enrichment, as ordered by the Court.

## TENTH CAUSE OF ACTION

**Violations of the California Consumer Legal Remedies Act**

**California Civil Code §1750, *et seq*.**

**(California Subclass Only)**

110.   Plaintiff restates and incorporate herein by reference the preceding paragraphs as if fully set forth herein.   This cause of action applies only to the proposed California Subclass.

111.   California's Consumers Legal Remedies Act ("CLRA"), Cal. Civil Code §1750, *et seq*., proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

112.   The gaming websites and the opportunities to play against other players in fantasy sports games that were provided by Defendants are "services" as defined in California Civil Code §1761(b), and were provided to the public (including

CLASS ACTION COMPLAINT

Plaintiff and the members of the Proposed California Subclass) through "transactions" as defined in California Civil Code §1761(e).

113.  Plaintiff and other members of the proposed California Subclass purchased their access to Defendants' sites, and placed money at stake in what they thought was a fair game of skill, for their own personal use, and are "consumers" as defined in California Civil Code §1761(d).

114.  As detailed above, Defendants' advertisements for their gambling sites were materially false and concealed material facts.  Defendants misrepresented that their gaming services were fair contests of skill, and concealed the fact that Defendants' employees were allowed to compete while in possession of insider information that gave them a substantial advantage over other, lay consumers.

115.  In purchasing and using Defendants' gaming services, Plaintiff and other members of the proposed California Subclass were deceived by Defendants' misrepresentations and concealments.

116.  Defendants' conduct, as described herein, was and is in violation of the CLRA.  Defendants' conduct violates at least §§1770(a)(5) and (a)(7) of the CLRA, prohibiting representing that services have .characteristics, uses, or benefits that they do not, or that services are of a particular standard or quality if they are of another.

117.  Plaintiff and other members of the proposed California Subclass have suffered injury in fact and actual damages resulting from Defendants' material omissions and misrepresentations because they paid a premium price to partake of Defendants' services, and because they lost money in unfair contests in which employees with inside information also participated.

118.  Defendants knew, should have known, or were reckless in not knowing that their employees were taking advantage of insider information in the manner described above.  Defendants further knew, should have known, or were reckless in not knowing that their contests were unfair.

119.  The facts concealed and omitted by Defendants to Plaintiff and other members of the proposed California Subclass were and are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase access to or participate in Defendants' gaming services.  Had Plaintiff and other members of the proposed California Subclass known the truth, they would not have purchased access to, risked money through, or participated in Defendants' online gaming services, or would not have paid the prices they paid.

120.  Plaintiff and the proposed class are entitled to equitable relief and a declaration that Defendants' conduct violates the Consumer Legal Remedies Act.

121.  Plaintiff disclaims any request for monetary relief (including punitive damages) under the Consumer Legal Remedies Act at this time, but reserves the right to seek such relief after providing Defendants with the notice required by the Act.

### **PRAYER FOR RELIEF**

Plaintiff, individually and on behalf of all others similarly situated, requests the Court to enter judgment against Defendants, as follows:

a.  Certifying the Class and the Subclass, as requested herein, certifying Plaintiff as the representative of the Class, and appointing Plaintiff's counsel as counsel for the Class;

b.  For damages suffered by Plaintiff and the proposed classes, including treble damages;

c.  For restitution to Plaintiff and the proposed classes of all monies wrongfully obtained by Defendants;

d.  For injunctive relief requiring Defendants to cease and desist from engaging in the unlawful, unfair, and/or deceptive practices alleged in the Complaint;

e.  An order granting injunctive relief as permitted by law or equity, enjoining Defendants from continuing the unlawful practices as set forth herein, and injunctive relief to remedy Defendants' past conduct;

f.      For Plaintiff's reasonable attorneys' fees, as permitted by law;

g.      For Plaintiff's costs incurred;

h.      For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

i.      For such other and further relief that this Court deems just and proper under equity or law, including the award of punitive damages.

DATED:  November 12, 2015

By:      _____/s/ Michael I. Katz_____
Mark P. Robinson, Jr.
Kevin F. Calcagnie
Daniel S. Robinson
**ROBINSON CALCAGNIE ROBINSON SHAPIRO DAVIS, INC.**
19 Corporate Plaza Drive
Newport Beach, California 92660
Telephone:  (949) 720-1288
Facsimile:  (949) 720-1292

Alan Greenberg
Wayne Gross
Michael Katz
**GREENBERG GROSS LLP**
650 Town Center Drive, Suite 1750
Costa Mesa, California 92626
Telephone:  (949) 380-2800
Facsimile:   (949)  383-2801

*Attorneys for Plaintiff Daniel Hale and the Proposed Classes*

1

## __JURY DEMAND__

2     Plaintiff, individually and on behalf of all class members, demands a trial by

3  jury on all claims so triable as a matter of right.

4

5

6  DATED:  November 12, 2015

7

8

9                              By:       /s/ Michael I. Katz
10                                     Mark P. Robinson, Jr.
                                       Kevin F. Calcagnie
11                                     Daniel S. Robinson
12                                     **ROBINSON CALCAGNIE ROBINSON**
                                       **SHAPIRO DAVIS, INC.**
13                                     19 Corporate Plaza Drive
14                                     Newport Beach, California 92660
                                       Telephone:  (949) 720-1288
15                                     Facsimile:  (949) 720-1292

16                                     Alan Greenberg
17                                     Wayne Gross
                                       Michael Katz
18                                     **GREENBERG GROSS LLP**
19                                     650 Town Center Drive, Suite 1750
20                                     Costa Mesa, California 92626
                                       Telephone:  (949) 380-2800
21                                     Facsimile:   (949)  383-2801

22                                     *Attorneys for Plaintiff Daniel Hale and the*
23                                     *Proposed Classes*

24

25

26

27

28

CLASS ACTION COMPLAINT